IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

MARK PFEFER o/b/o D.A.S.,[1]

                    Plaintiff,

vs.                                              Case No. 21-2083-SAC

KILOLO KIJAKAZI, Acting
Commissioner of Social Security
Administration,

                    Defendant.

**MEMORANDUM AND ORDER**

This is an action appealing the denial of Social Security disability benefits.  Plaintiff filed applications for disability insurance benefits, child disability benefits, and supplemental security income benefits in 2015.  Plaintiff alleges a disability onset date of November 21, 2015.  An administrative law judge (ALJ) conducted a hearing on August 5, 2020, considered the evidence, and decided on August 20, 2020 that plaintiff was not qualified to receive benefits.  This decision has been adopted by defendant.[2] This case is now before the court upon plaintiff's request to reverse and remand the decision to deny plaintiff's applications for benefits.

---

[1] The initials are used to protect privacy interests.  Mr. Pfefer's name has different spellings in the record.  The court is using the spelling contained in the caption of the complaint.
[2] There was a previous hearing in October 2018.  The decision following that hearing was remanded for further consideration by the Appeals Council.

I. <u>Standards of review</u>

To qualify for disability benefits, a claimant must establish that he or she was "disabled" under the Social Security Act, 42 U.S.C. § 423(a)(1)(E), during the time when the claimant had "insured status" under the Social Security program.  See <u>Potter v. Secretary of Health & Human Services</u>, 905 F.2d 1346, 1347 (10th Cir. 1990); 20 C.F.R. §§ 404.130, 404.131.  To be "disabled" means that the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

The court must affirm the ALJ's decision if it is supported by substantial evidence and if the ALJ applied the proper legal standards.  See <u>Wall v. Astrue</u>, 561 F.3d 1048, 1052 (10th Cir. 2009).  "Substantial evidence" is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Biestek v. Berryhill</u>, 139 S.Ct. 1148, 1154 (2019)(quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)).  This standard is "not high," but it is "'more than a mere scintilla.'" <u>Id.</u>, (quoting <u>Consolidated Edison</u>, 305 U.S. at 229).  It does not require a preponderance of the evidence.  <u>Lax v. Astrue</u>, 489 F.3d 1080, 1084 (10th Cir. 2007).

The court must examine the record, including whatever in the record fairly detracts from the weight of the defendant's decision, and on that basis decide if substantial evidence supports the decision.  Glenn v. Shalala, 21 F.3d 983, 984 (10th Cir. 1994) (quoting Casias v. Secretary of Health & Human Services, 933 F.2d 799, 800-01 (10th Cir. 1991)).  The court may not reverse the defendant's choice between two reasonable but conflicting views, even if the court would have made a different choice if the matter were referred to the court de novo.  Lax, 489 F.3d at 1084 (quoting Zoltanski v. F.A.A., 372 F.3d 1195, 1200 (10th Cir. 2004)).  The court reviews "only the sufficiency of the evidence, not its weight."  Oldham v. Astrue, 509 F.3d 1254, 1257 (10th Cir. 2007).

II. The ALJ's decision (Tr. 10-29).

The ALJ made the following specific findings in his decision. First, plaintiff had not attained the age of 22 on the alleged disability onset date.  Second, plaintiff met the insured status requirements for Social Security benefits through June 30, 2017. Third, plaintiff has not engaged in substantial gainful activity since November 21, 2015.  Fourth, plaintiff has the following severe impairments: "history of traumatic brain injury (TBI) and anoxic brain injury resulting in restricted visual fields, neurocognitive disorder, adjustment disorder, learning disorder, attention deficit/hyperactivity disorder (ADHD), depressive disorder, generalized anxiety disorder, intermittent explosive

3

disorder, and polysubstance use disorder." (Tr. 15). The ALJ also acknowledged that plaintiff has elevated blood pressure, obesity, mild left-sided "incoordination" and spasticity, but he determined that these conditions did not cause more than minimal functional limits on plaintiff's ability to work. (Tr. 15).

Fifth, including plaintiff's substance use, plaintiff's impairments meet the criteria for disability of section 12.06 of 20 C.F.R. Part 404, Subpart P, Appendix 1. Sixth, without substance use, the remaining limitations would cause a severe impairment or combination of impairments.

Seventh, plaintiff, if he stopped substance use, has the residual functional capacity (RFC) to perform a full range of work at all exertional levels but with the following non-exertional limits:

> limited to jobs that [d]o not require peripheral vision. He is able to carry out detailed but uninvolved instructions to perform simple, routine, and repetitive tasks; involving only simple work-related decisions; with few, if any, workplace changes. Any workplace changes are infrequent and introduced gradually. He can tolerate occasional interaction with coworkers and supervisors and with the public. He is able to concentrate and persist for 2-hour periods prior to needing a regularly scheduled break. He can tolerate a low level of work pressure defined as work not requiring multitasking, significant independent judgment or sharing of job tasks. He must work jobs where in the supervisors are onsite and will make periodic checks on the workers.

(Tr. 20).

Eighth, plaintiff is unable to perform past relevant work. Ninth, if plaintiff stopped substance abuse, he could perform jobs

4

that exist in significant numbers in the national economy such as janitor, order picker, and hand packager.

III. <u>Mental functional capacity analysis by ALJ</u>

    A. <u>Background</u>

Plaintiff experienced a TBI from a vehicular accident in April 2015. Following that, in November 2015, plaintiff suffered a loss of oxygen to the brain (an anoxic brain injury) which caused a coma and significant loss of mental and physical functioning. Plaintiff engaged in lengthy therapy which restored a substantial amount of plaintiff's functionality but left some mental and physical deficits. In this order, the court shall focus upon plaintiff's mental functioning as it relates to his claim for disability benefits.

    B. <u>Symptoms</u>

The ALJ listed plaintiff's mental symptoms as including: difficulty staying on task; poor concentration and focus; irritability; restlessness; mood swings; slow thoughts; anxiety; decreased processing speed; increased impulsivity; limited ability to answer complex and abstract questions; struggling to follow multi-step instructions with 100 percent accuracy; and difficulty recalling lists and appointments. (Tr. 22). The ALJ attributed some of this to his brain injury and noted that plaintiff showed

significant improvement over time.[3]  Id.  This improvement was exemplified by plaintiff recalling personally relevant information, engaging in activities (visiting the rifle and archery ranges, and playing basketball), and performing personal care independently.  Plaintiff was able to use his iPhone for reminders and planning with only mild to moderate cues for scheduling and time management.  He was also able to fix simple meals independently.[4]  Id.  The ALJ quoted a very general comment from plaintiff's treating neurologist on March 31, 2016 that plaintiff had shown "remarkable signs" of recovery and that he realistically expected plaintiff to function better.  (Tr. 22).

---

[3] The record reflects that plaintiff had significant learning difficulties in school prior to his TBI and later anoxic brain injury.  The ALJ noted that plaintiff had an individualized education plan while in high school, but was able to graduate on time.  (Tr. 23).

[4] The exhibit the ALJ cited for these findings, a February 23, 2016 report from a rehabilitation facility called QLI, made clear that plaintiff still needed significant support:

> [Plaintiff] currently requires an intensive, 24-hour rehabilitation program to ensure his overall safety while targeting his deficits in attention, memory, organization, and higher level cognitive skills (e.g., reasoning, mental flexibility, problem solving, awareness of deficits, etc.).  It is anticipated that with further individualized and intensive rehabilitation, [he] will continue making gains in areas expected to decrease caregiver burden and increase [his] safety and independence.
> . . . .
> Though is now independent with basic ADLs, [plaintiff] still requires 24-hour [supervision] due to physical and cognitive deficits that put him at a safety risk . . . It is likely that his level of care will continue to decrease if provided with time for skilled rehabilitation during this crucial phase in his recovery.
> . . . .
> [Plaintiff] requires 24 hour skilled nursing supervision and support to manage his medication and healthcare needs at this time including ensuring that he is on the appropriate medication regimen to support his health and continued rehabilitation.

(Tr. 1225-1227).

The exhibit the ALJ cited did not go into any detail regarding, for instance, plaintiff's ability to follow instructions, answer questions, process information, or recall appointments. Nevertheless, the ALJ concluded that: "These findings and [plaintiff's] ability to engage in and complete these tasks suggest his symptoms would have only a moderate effect on his ability to understand, remember or apply information and concentrate, persist, or maintain pace in the absence of substance use." (Tr. 22-23).

The ALJ noted that: plaintiff has not suffered mania or psychosis; he has not had regular panic attacks or suicidal ideations; nor has he needed inpatient treatment for depression or anxiety; indeed, during some examinations he has denied depression. (Tr. 23). In general, the ALJ concluded that plaintiff's overall "moderate level of treatment" was not suggestive of disabling limitations from his mental impairments (Tr. 24), although he did not explain why he reached this conclusion.

### C. Evaluation of plaintiff's and his mother's statements

The ALJ said that plaintiff's statements and his mother's statements were generally inconsistent with the evidence, although he did not specifically describe the contradictory evidence. (Tr. 24-25).

D. Consideration of reports, evaluations and opinions

The ALJ granted little weight to reports made within a few months of plaintiff's anoxic brain injury in November 2015 because plaintiff made substantial progress after that injury.   He determined that those reports did not reflect plaintiff's functional capacity throughout the relevant period.   (Tr. 25). His analysis of other medical reports, examinations, evaluations and opinions is summarized as follows.

1. Dr. McNeley-Phelps

Dr. McNeley-Phelps examined and tested plaintiff in August 2016, nine months after plaintiff's coma.   She concluded that plaintiff seemed to require ongoing supervision and that he was capable of learning and performing simple, repetitive tasks but would need to be monitored constantly on the job site in order not to get distracted.   (Tr. 1314-15).   She also noted that plaintiff needed help managing his funds.   (Tr. 1315).   The ALJ gave this opinion "little weight" because:   "the signs and findings . . . are not wholly consistent with [plaintiff's] presentation while using substances"; the doctor observed only "mild neurocognitive abnormalities, but subsequent neuropsychological testing revealed major limitations"; and the doctor did not state to what extent plaintiff's drug and alcohol use impacted presentation.[5]   (Tr. 25-

---

[5] Dr. McNeley-Phelps reviewed plaintiff's medical and therapeutic records from several sources before issuing her report and stated as part of her diagnosis

26).  The ALJ did not identify, however, specific periods of time when plaintiff either was or was not using drugs and alcohol.

2. Kansas Department of Aging's functional assessments

The ALJ also gave "little weight" to a functional assessment done for the Kansas Department of Aging in March 2018.  The assessment concluded that plaintiff had moderate to severe problems with:  attention and concentration; learning and memory; judgment and perception; and initiation and planning.  (Tr. 2048). The ALJ gave the assessment little weight because the terms "moderate" and "severe" were not well-defined and because plaintiff continued to show improvement after March 2018 by working part-time and performing "many activities of daily living independently."  (Tr. 26).

The ALJ gave "some weight" to a March 2020 assessment by the Kansas Department of Aging.  (Tr. 26).  The assessor was the same person who did the March 2018 assessment.  The 2020 assessment indicated:  some memory problems including moderate problems remembering information learned in school or on the job; difficulty paying attention; lack of recognition of personal limitations and disabilities; susceptibility to victimization; needing limited assistance on some occasions with meal preparation; needing supervision and cueing with ordinary housework and transportation;

---

that plaintiff's substance abuse disorders were in remission at that time.  (Tr. 1311 & 1314).

requiring maximal assistance with managing finances; and needing extensive assistance with managing medications and shopping. (Tr. 2129-2135). The ALJ stated that this report was cumulative of plaintiff's reports or his friends' reports, and not based upon objective or clinical findings. (Tr. 26). He commented that plaintiff can perform "many tasks independently with some assistance from family and/or services." (Tr. 26). He also found that the assessment's analytical approach was not the same as the five-step approach used to determine eligibility for disability benefits. (Tr. 26).

### 3. Dr. Mitzi Groves

In July 2020, Dr. Mitzi Groves completed a report of examination and evaluation. She described plaintiff as having mild to moderate dementia, "depression/anxiety mod.," and a severe learning disability. (Tr. 2160). She stated that plaintiff had a poor memory and problematic executive function. (Tr. 2161). She recommended continued therapy and a guardianship, noting that plaintiff did not have the capacity to meet his health and safety needs or the capacity to manage his estate. (Tr. 2161-62). The ALJ gave this opinion "little weight" because it was based upon a one-time examination and there was no evidence of a treating relationship. (Tr. 27). The ALJ also determined that plaintiff's ADLs did not support Dr. Groves' findings. (Tr. 27).

4. Dr. Bertrand Gallet

Also in July 2020, Dr. Bertrand Gallet reviewed the imaging findings of plaintiff's head in 2015 and 2020.  (Tr. 2164).  He observed in his one-page report that the initial CT scan in 2015 did not appear to show any acute brain abnormalities, but in retrospect he thought "there is diffuse cerebral edema with sulci and ventricles being unusually small in size." (Tr. 2164).  He said an MRI in 2015 showed "diffuse acute infarction (ischemis) of the white matter surrounding the lateral ventricles, in addition, there is acute infarction of the corpus callosum" which was "undercalled" in the initial report.  Id.  He further stated that the MRI showed "a small acute infarction of the right basal ganglia."  Id.  These findings, he noted, were "secondary to a severe hypoxic or anoxic ischemic event resulting in acute brain death of the white matter due to lack of appropriate levels of oxygen."  Id.  Finally, he said that the 2020 CT scan:

> compared with the 2015 study, shows interval development of mild to moderate atrophy of the brain volume for [the] patient's age as well as moderate . . . loss of brain tissue in the white matter surrounding the lateral ventricles.  The CT has an appearance usually seen in older patients, 70s and 80s, and typically secondary to chronic small vessel ischemic white matter disease.  The imaging findings are consistent with a functional diagnosis of vascular dementia.

Id.

The ALJ found that Dr. Gallet's "new diagnosis of vascular dementia does not meet the durational requirement nor is there

evidence to support that the claimant has significant limitations
due to this new diagnosis." (Tr. 28). The ALJ further concluded
that the results of plaintiff's physical examinations did not show
deficits in plaintiff's mental functioning. (Tr. 28).

### 5. State agency psychological consultants

The ALJ also gave "some weight" to the state agency
psychological consultants' opinions to the degree that their
opinions concerned plaintiff in a state of sobriety.[6]  (Tr. 24).
He found their opinions "generally consistent with the clinical
signs and findings" and with plaintiff's ADLs while sober. (Tr.
24). Again, the ALJ did not specify when plaintiff was sober and
when he was not. Dr. George Stern, one of the consultants,
concluded that plaintiff had limited sustained concentration and
persistence. (Tr. 161). He further found that plaintiff was
moderately limited in his ability to maintain attention and
concentration for extended periods and to carry out detailed
instructions. (Tr. 162). He concluded that plaintiff could carry
out simple, one and two-step instructions. (Tr. 161-62). Dr.
Raphael Smith, another consultant, concluded that plaintiff was
markedly limited in his ability to understand, remember and carry
out detailed instructions, and moderately limited in his ability
to sustain an ordinary routine without special supervision and an

---

[6] The ALJ stated he gave their opinions "little weight" to the extent the
opinions addressed plaintiff's mental functional capacity while using drugs.
(Tr. 18).

unreasonable number of breaks, and in his ability to maintain attention and concentration for extended periods.  (Tr. 108).  He found that plaintiff had the mental RFC for simple work with limited social and public interaction.  (Tr. 123).

The ALJ did not attempt to account for any differences between the state agency psychological consultants' opinions.

### 6. Dr. Neal Deutch

The ALJ discussed the results of a neuropsychological examination given by Dr. Neal Deutch on May 2, 2018.  The ALJ stated:

> [Plaintiff] initially focused his attention and exhibited a normal ability to sustain concentration.  However, test results showed major neurocognitive impairment, including extremely low working memory, extremely low sustained concentration and divided attention for multi-tasking.  The objective evidence and findings were considered consistent with marked limitations in his ability to understand, remember, or apply information, and concentration, persist, or maintain pace.

> Although the neuropsychologist acknowledged substance use as a part of the claimant's history, the examiner did not confirm nor deny the claimant's last substance use.  However, the record reveals that around the time of the neuropsychological examination, the claimant admitted to intravenous amphetamine use.  Given the claimant's persistent drug and alcohol use, it is reasonable to assume the acute effects of the claimant's drug or alcohol use had not abated by the time of the neuropsychologist's examination.

(Tr. 17-18)(citations to exhibits omitted).  Dr. Deutch wrote that plaintiff's effort was good and that the testing results "should be considered a valid representation of [plaintiff's] current level of cognitive functioning."  (Tr. 2055).

7. Dr. Paul Cochran

On June 4, 2018, during the initial psychiatric evaluation upon plaintiff's admission into Brookhaven Hospital for inpatient treatment, Dr. Paul Cochran wrote that plaintiff had a "significant cognitive disability particularly in the areas of executive function." (Tr. 1652). On July 5, 2018, he wrote a psychiatric discharge summary at the conclusion of plaintiff's inpatient treatment at Brookhaven Hospital. He stated in part: "[I]ntellectual impairment will continue to be a significant barrier to working through some of [plaintiff's] difficulties and contribute to lack of insight and appreciation for the danger of medications/substances of abuse." (Tr. 1644).

The ALJ did not discuss these evaluations from Dr. Cochran in his order.

8. Other examinations

The ALJ concluded that plaintiff's "most recent physical examinations show" that plaintiff "has not exhibited any deficits in his mental functioning[.]" (Tr. 28). The ALJ cited the following exhibits to support this conclusion:

Ex. 13F/4-5 – a record from Dr. Nashatizadeh from May 2016 which reflects: cognitive dysfunction; some verbal dysfluency; some comprehension processing difficulty; distractible attention; and some memory deficit, particularly recent memory.

Ex. 17F/3-7, 10-13 – records from Dr. Alexandra Nielsen from October 2016 and November 2016 which indicate: part-time work; remaining executive dysfunction; requiring assistance

14

for driving and money management; depression; anxiety; alert and conversant; oriented to person, location and date; unable to perform three digits backwards; speech fluent and clear; residual functional impairments including mood/behavioral disturbance and cognitive impairments (including poor attention and executive dysfunction impairment); impaired IADLs; and substance abuse.

Ex. 20F/27-29, 33-35 – records from Mind Matters dated November 2016 and March 2016 which reflect: in March 2016, plaintiff had moderate to severe problems with attention and concentration, learning and memory, and initiation and planning; in November 2016 plaintiff made progress learning how to resolve issues with his parents.

Ex. 24F/22 – records from Dr. Paul Cochran of Brookhaven Hospital in June 2018 which indicate that plaintiff was alert and oriented and able to engage in conversation.

Ex. 30F/98-101, 109-113 – records from Dr. Elizabeth Cristiano and Mandy Yates, an APRN-NP, in September 2018 which reflect: plaintiff oriented to person, time and place, with normal mood and behavior; and negative for decreased concentration, not easily distracted.

Ex. 45F/7 – emergency room record dated June 2020: after falling from the lawn mower plaintiff appeared alert, oriented and in a normal mood; he behaved well and was cooperative.

Ex. 48F/6-7 – records from Dr. Lisa Moravac in June 2020 that reflect: plaintiff shows poor recent memory but is well-appearing and may return to work with no restrictions.


E. Former employers' opinions

Two former employers wrote letters regarding plaintiff's work

capacity. On October 8, 2018, Brian Barnett wrote that plaintiff

worked for 3 to 6 hours per week helping around a shop and assisting

a mechanic. (Tr. 642). He said plaintiff needed a lot of reminders

to stay on task and needed extra time to perform his work. The

ALJ gave this report little weight because Mr. Barnett is not a
medical source, plaintiff had only worked three weeks for the
company when the letter was written, and because the account was
inconsistent with plaintiff's ADLs.  (Tr. 25).

On July 30, 2020, Bruce Doctor wrote that plaintiff had worked
for his lawn and landscaping company, mostly part-time, for over
one year.  He said plaintiff was hired because of a family
connection and it was known that plaintiff would need close
supervision.  He stated that plaintiff was "very challenged and
would be considered unemployable due to problems with cognitive
function and poor decision-making."  (Tr. 678).  He also stated
that plaintiff needed "a very high level of supervision which most
companies could not provide."  (Tr. 678).  Doctor related that
plaintiff was injured on the job when he fell from a stand-up mower
that plaintiff should not have been driving.  The ALJ gave the
report "partial weight" because he thought it showed that plaintiff
had been able to work part-time earning significant amounts of
money in 2019 and 2020 and that it showed he was able to work on
a jobsite with little supervision.  (Tr. 27).  The ALJ noted that
there was no indication that the accident was related to
plaintiff's brain injury.  (Tr. 27).

F. Activities of daily living

The ALJ relied upon plaintiff's ADLs to support the denial of
benefits.  The ADLs mentioned in the opinion were:  bathing,

16

dressing, personal hygiene, feeding and toileting, visiting the rifle and archery ranges and batting cages, working out at a gym, playing basketball, working at landscaping companies, using a laptop to watch Netflix, using Instagram, planting things in the yard, keeping his room clean, going on dates with his girlfriend, walking a dog, and loading and unloading the dishwasher. (Tr. 16, 21, 23).

IV. The ALJ's findings as to the materiality of drug and alcohol use (DAA) and plaintiff's RFC are not supported by sufficient or substantial evidence.

Plaintiff contends, among many other arguments, that the ALJ did not properly analyze the materiality of plaintiff's drug and alcohol use, and that the ALJ's RFC findings are unsupported by substantial evidence.  The court addresses these two issues together in this section of the order.

A. Standards

Plaintiff must not be considered disabled for the purpose of receiving benefits if drug addiction or alcoholism (DAA) is a contributing factor material to a determination that plaintiff is disabled.  42 U.S.C. § 423(d)(2)(C).  If it is determined that plaintiff is disabled and there is evidence of DAA, then the ALJ must decide whether the DAA is a material contributing factor to the disability determination.  20 C.F.R. § 404.1535(a).  Plaintiff has the burden to show that DAA is not material.  Cage v. Commissioner of SSA, 692 F.3d 118, 123-25 (2d Cir. 2012)(citing

cases from four other circuit courts); SSR 13-2p, 2013 WL 621536
at *4.

The ALJ, however, "must provide sufficient information so
that a subsequent reviewer considering all of the evidence in the
case record can understand the reasons for . . . [t]he finding
that the claimant would not be disabled . . . in the absence of
DAA." SSR 13-2p, 2013 WL 621536 at *14. The best evidence is
improvement during periods of abstinence. Barrett v. Berryhill,
904 F.3d 1029, 1032 (7th Cir. 2018). The ALJ did not provide
sufficient evidence or information in this instance.

The court reviewed the standards for considering "substantial
evidence" in part I of this opinion.

B. Impact of substance use

The ALJ determined generally that plaintiff was disabled from
employment if he did not stop substance use, but that, if he did
stop substance use, he could perform jobs which exist in the
national economy consistent with the RFC formulated by the ALJ.
The ALJ did not cite evidence, however, regarding the impact of
substance use upon plaintiff's functional capacity and the ALJ's
analysis of the impact of plaintiff's brain injuries, which also
relates to his RFC findings, lacks the support of substantial
evidence.

The ALJ stated that it is reasonable to assume that the
results of Dr. Deutch's examination in May 2018 were impacted by

DAA that had not abated by the time of the examination. (Tr. 18). The ALJ, however, provides no evidence of the impact or the degree of impact, only that plaintiff engaged in substance use around the time of the examination. As stated earlier, Dr. Deutch considered the test results to be a valid indicator of plaintiff's cognitive functioning. Furthermore, Dr. Deutch concluded in his report that plaintiff's dysfunction in frontal – temporal networks was very likely a result of anoxia and prior traumatic brain injury. (Tr. 2060). Dr. Deutch did not attribute this to substance use, although he discussed plaintiff's substance use and need for treatment in his report, and he diagnosed plaintiff with substance use disorders. (Tr. 2060).

At Tr. 18, the ALJ referred to records from plaintiff's neurologist, Dr. Nielsen, where she stated that: "[Plaintiff's] biggest functional barrier at present is poorly controlled depression, anxiety, and substance abuse with recent inpatient psychiatric hospitalization for reportedly unintentional benzodiazepines overdose (obtained recreationally)." (Tr. 1908). Context is significant here. Dr. Nielsen saw plaintiff numerous times from October 2016 until July 2018, more regularly and over a broader period of time than any other physician in the record. In the notes of almost every visit, Dr. Nielsen mentioned that plaintiff had cognitive impairment (including poor attention and impaired executive function) and impaired IADLs. (Tr. 1324, 1855,

1861, 1866, 1872, 1892, 1897, 1902, 1908, 1914, 1919). Dr. Nielsen assessed plaintiff with substance abuse disorders four times: October 14, 2016 (Tr. 1324); March 26, 2018 (Tr. 1908); May 21, 2018 (Tr. 1914); and July 23, 2018 (Tr. 1919).

The comment referred to by the ALJ was made on March 26, 2018. Dr. Nielsen saw plaintiff after an incident in early February 2018 where plaintiff took an overdose of Xanax and was hospitalized. Before that, plaintiff had a several-day period of taking drugs and alcohol. Plaintiff told Dr. Nielsen that his mood and depression had worsened due to stress from work, school and the illness of his grandmother. This background seems to explain Dr. Nielsen's comment at Tr. 1908 that plaintiff's biggest functional barrier "at present" was poorly controlled depression, anxiety and substance abuse.

On July 28, 2018, Dr. Nielsen remarked that cognitive impairment, executive dysfunction and substance abuse continued to be significant barriers to IADLs. (Tr. 1919). This comment was made after plaintiff had finished an inpatient drug rehabilitation session at Brookhaven Hospital in Oklahoma and was living in a "sobriety house." He was presumably sober. But, Dr. Nielsen observed impaired initiation, reasoning and insight. (Tr. 1919). She also stated that "[c]ognitive impairment, executive dysfunction, [and] substance abuse continue to be significant barriers to IADLs." (Tr. 1919). In notes from a February 15,

2017 appointment, Dr. Nielsen mentioned ongoing employment issues during a period when there did not appear to be significant substance abuse issues with plaintiff. (Tr. 1864 & 1866). A review of Dr. Nielsen's records on the whole suggests that plaintiff suffered from significant and disabling mental disabilities even if he abstained from substance use.

Nevertheless, the ALJ concluded that plaintiff's cognitive functioning varied significantly while using substances. (Tr. 17). To support this point, he noted that in August 2016, plaintiff was able to recall four out of four objects after a short delay and the consultative examiner diagnosed only mild neurocognitive deficits. (Tr. 17). He further noted in contrast that in October 2016 plaintiff was unable to name even 3 digits backward. (Tr. 17). The court does not find a convincing link between substance use and these contrasting results. The report from October 2016 indicates that plaintiff had not used alcohol or drugs recently (Tr. 1321) and that plaintiff was a fairly reliable historian. (Tr. 1323). The August 2016 results are from Dr. McNeley-Phelps who concluded, after examining plaintiff during a period of remission in substance use, that plaintiff seemed to require ongoing supervision and would need constant monitoring, despite naming four out of four objects after a short delay. (Tr. 1314-15).

21

The court further notes that Dr. Smith and Dr. Stern concluded that plaintiff was markedly or moderately limited in the ability to carry out detailed instructions and moderately limited in the ability to complete a normal workday and workweek without interruptions and to perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 108, 198). These limitations were not attributed by Dr. Smith or Dr. Stern to plaintiff's DAA.

Looking at the record, the doctors who specialized in brain function or mental health and who evaluated plaintiff's functional limitations in detail, attributed plaintiff's limitations to brain injury, not substance use.  See Dr. McNeley-Phelps (Tr. 1314-15); Dr. Groves (Tr. 2160); Dr. Deutch (Tr. 2053-2060); Dr. Smith (Tr. 105-109); Dr. Stern (Tr. 158-163).  The ALJ does not refer to sufficient information to show that without DAA the examination results produced or considered by those doctors, would have reflected a substantially greater mental functional capacity.

C. Impact of plaintiff's brain injuries

The materiality of DAA may be shown with evidence in the case record "demonstrating that [during a period of abstinence] any remaining limitations were not disabling."  SSR 13-2P, 2013 WL 621536 at *12.  The ALJ does not expressly make findings regarding plaintiff's limitations during periods of abstinence.  Rather, the ALJ found that plaintiff's ADLs, part-time employment, and the

observations made during some examinations show that plaintiff's functional limitations do not exclude him from substantial gainful employment.   This contention is not supported by substantial evidence.

### 1. ADLs and part-time employment

The ALJ relies mainly upon two types of evidence to show that the impact of plaintiff's brain injuries is not disabling without correlating this evidence to periods of abstinence.   One type of evidence is a description of plaintiff's activities of daily living (ADLs) and his part-time employment.[7]   The ALJ, however, does not explain in any detail why the ADLs are inconsistent with the cognitive impairments or functional limits determined by the medical sources.   None of the activities as briefly described by the ALJ in his opinion approximates what could be considered substantial gainful activity and does not substantially detract from the believability or authority of the medical opinions in this case.   See Thompson v. Sullivan, 987 F.2d 1482, 1489-90 (10th Cir. 1993)(light housework and visiting neighbors does not establish ability to do substantial gainful activity); H.G. v. Saul, 2021 WL 534284 *5 (D.Kan. 2/12/2021)(same conclusion where there was evidence that the claimant cared for young daughter, took lengthy trips, and did household chores, occasional errands,

---

[7] The court summarized these ADLs at p. 16-17 of this order.

and doctor-ordered exercise); Pemberton v. Berryhill, 2017 WL 1492934 *6 (D.Kan. 4/26/2017)(personal care with help, shopping and driving provides little or no support for finding that a claimant can perform full-time competitive work); De Anda v. Colvin, 2016 WL 9777255 *8 (D. N.Mex. 9/27/2016)(ALJ improperly rejected doctor's opinion based on ADLs which on a realistic level were more consistent with assessed nonexertional mental limitations); Tate v. Colvin, 2016 WL 4679942 *2-4 (D.Kan. 9/7/2016)(rejecting ALJ's reliance upon simple housework, personal hygiene, shopping and spending time with others).

Plaintiff's part-time work for landscaping companies also does not demonstrate a capacity for full-time competitive work. The ALJ suggests that the opinion of Mr. Barnett, one of plaintiff's landscaping employers, lost credibility because plaintiff had only worked there for three weeks. This is a far longer period of time for an employment evaluation than that of any other source in the administrative record with the exception of plaintiff's other landscaping employer, Mr. Doctor. Both employers' remarks suggest that plaintiff would not be suitable for full-time employment without a great amount of supervision and extra time to do his work.

In sum, both employers indicated from their experience with plaintiff, during what may have been periods of abstinence, that plaintiff was incapable of full-time employment by an ordinary

24

employer.  This is evidence that his DAA was not a material factor to his disability.

### 2. Examination findings

The other kind of evidence relied upon by the ALJ is material from doctors' examinations.  The ALJ referred to a record from Dr. Nielsen on July 23, 2018 to indicate that plaintiff had maintained sobriety for a period and reported improved mood and sleep.  (Tr. 23, referring to Ex. 30F/91-94).  As already noted, however, Dr. Nielsen consistently assessed plaintiff with impaired initiation, impaired reasoning and impaired insight.  She stated in the exhibit referred to by the ALJ that plaintiff had:  "residual functional deficits including mood/behavioral disturbance, cognitive impairment (including poor attention and impaired executive function) . . . and impaired IADLs."  (Tr. 1919).  The ALJ did not reference these comments in his opinion.

The ALJ also referred to Ex. 30F/119.  (Tr. 23).  This is a record from Dr. Joan Collison dated October 25, 2018.  She, together with Dr. Gershom Hernandez, saw and evaluated plaintiff on that day.  Dr. Collison concurred with Dr. Hernandez' assessment,[8] but added that plaintiff had a neurocognitive disorder and referred to the diagnosis of "Major Neurocognitive Disorder

---

[8] This assessment was:  Generalized Anxiety Disorder; Traumatic Brain Injury; Cannabis use disorder, in full remission; Alcohol use disorder, in full remission; Sedative, hypnotic, or anxiolytic use disorder, in full remission; ADHD by history.  (Tr. 1944).

(Dementia)" by Dr. Deutch.  (Tr. 1945).  This was not mentioned by the ALJ.

The ALJ further cited the notes of Mandy Yates, an APRN-nurse practitioner, who interviewed plaintiff on September 25, 2018. (Tr. 23, referring to Ex. 30F/109-113).  This report indicated that, according to plaintiff, he was sober and had been for a significant period.  (Tr. 1937); see also (Tr. 2014).  It stated that plaintiff was positive for sleep disturbance, anxiety, and fatigue, but negative for confusion, decreased concentration, agitation, and behavioral problems.  (Tr. 1937).  It was further reported that plaintiff's recent and remote memory were intact, his attention span and concentration were intact, his mood was fine, and his thought process was linear and goal directed.  (Tr. 1938).

The ALJ cited the records of Dr. Hernandez from January 11, 2019.  (Tr. 23).  These stated that plaintiff denied a depressed mood, sleep disturbance, low energy, difficulty concentrating or anxiety.  (Tr. 2022).  They also mentioned that plaintiff's father said plaintiff was doing "very well."  (Tr. 2022).

The ALJ noted that plaintiff was recommended by Minds Matter for "CT" (cognitive therapy) on April 29, 2020 because there was a need to address planning and organization, problem-solving, memory, sequencing, attention, executive function, task initiation

and completion.[9]  (Tr. 23, referring to Tr. 2141).  The court is not aware of further therapy, however.

The ALJ also supported his decision with records of plaintiff's treatment following his lawnmower accident on or about June 17, 2020.  The ALJ noted that plaintiff was told he could return to work on June 19, 2020.[10]  (Tr. 24 citing, Tr. 2146 and Tr. 2171).  He further noted that plaintiff exhibited normal judgment and insight, orientation, speech and intact recent and remote memory.  (Tr. 24, citing Tr. 2174).

The court does not believe this is sufficient information to conclude that, without DAA, plaintiff is capable of substantial gainful employment.  The doctors and other evaluators who examined plaintiff and assessed plaintiff's capacity for employment, together with his past employers, have made statements buttressing the conclusion that plaintiff does not have the capacity for full-time work.  Given their context, the isolated statements from doctor's visits in January 2018 or June 2020 are not sufficient to support the ALJ's conclusions.  These statements did not concern plaintiff's long-term functional capacity, they did not address

---

[9] The ALJ construed the document as referencing a CT scan, but the court believes it refers to cognitive therapy.  Minds Matter provided frequent speech therapy, occupational therapy, and cognitive therapy sessions to improve plaintiff's independence during most of 2016, the first half of 2018, the first three months of 2019.  Ex. 20F, Ex. 29F and Ex. 41F.  Records from 2017 also refer to plaintiff receiving help from Minds Matter.  E.g., Tr. 1870, 1895.

[10] There is no contention, of course, that this was substantial gainful employment.

his capacity to return to perform a full-time job, and they did not speak to the materiality of plaintiff's DAA.

What remains are the conclusions of Dr. Smith and Dr. Stern that were given "some weight" by the ALJ toward the formulation of the RFC.  The court does not believe the conclusions of Smith and Stern constitute substantial evidence showing that plaintiff's brain injury is not disabling for the following reasons.  First, the ALJ does not state good reasons for giving Smith and Stern's conclusions "some weight."  The ALJ vaguely states that their findings are "generally consistent with the clinical signs and findings" without describing what those are.  (Tr. 24).  It should be noted that Smith and Stern's findings were made without considering the seemingly inconsistent findings of Dr. Groves, Dr. Gallet, Dr. Cochran and Dr. Deutch.  Second, the ALJ states that Smith and Stern's conclusions are "generally consistent" with plaintiff's ADLs.  (Tr. 24).  The court has already noted though, that plaintiff's ADLs do not support plaintiff's capacity to do full-time employment.  Finally, the conclusions of Smith and Stern that plaintiff can do "simple work" or carry out "one- and two-step instructions" do not clearly support the RFC which states that plaintiff can execute "detailed but uninvolved instructions to perform simple, routine, and repetitive tasks."  Detailed instructions are considered by some sources as more than one- or two-step instructions.  See Dictionary of Occupational Titles,

28

Appendix C, Section III.  Moreover, the testimony of the vocational expert, upon which the ALJ relied, appears to consider the RFC to encompass detailed but uninvolved instructions, as opposed to simple one- or two-step instructions.  (Tr. 65).  This seems contrary to the findings of Smith and Stern.

V. Other issues

Plaintiff has raised other issues in his brief including whether the ALJ properly considered plaintiff's vision deficits and fatigue issues.  The court will not reach the other issues raised by plaintiff because they may be affected by the ALJ's resolution of the case on remand.  The court, however, would encourage a more complete consideration of the impact of fatigue upon plaintiff's mental and physical capacity to perform full-time employment.

Plaintiff has requested a remand directing the immediate award of benefits. It is within the court's discretion to remand either for further administrative proceedings or for an immediate award of benefits. Farmer v. Astrue, 832 F.Supp.2d 1293, 1302 (D.Kan. 2011). Relevant factors to consider are the length of time the matter has been pending and whether remand for additional fact-finding would serve a useful purpose. Id. A decision to award benefits directly should be made only when the administrative record has been fully developed and when substantial and

29

uncontradicted evidence in the record indicates that the claimant is disabled and entitled to benefits. Id.

This matter has been pending for a lengthy time, but not an entirely unusual amount.   In addition, the court believes that additional fact-finding could serve a useful purpose as to the issues discussed in this order and other issues raised by plaintiff.   Therefore, the court shall not remand for an immediate award of benefits.

VI. Conclusion

For the reasons explained above, the court directs that the decision of the Commissioner be reversed and that judgment be entered pursuant to sentence four of 42 U.S.C. § 405(g) remanding the case for further proceedings consistent with this memorandum and order.

**IT IS SO ORDERED.**

Dated this 20th day of December 2021, at Topeka, Kansas.

s/Sam A. Crow
U.S. District Senior Judge